UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. ) Case No. 12-CR-0201-CVE
)
ROBERTO MONTEL MADDEN, )
)
Defendant. )

# OPINION AND ORDER

Now before the Court are the following motions: Defendant's Motion in Limine Regarding Gang Affiliation (Dkt. # 18); Defendant's Motion in Limine Regarding [Defendant's Statement and Officer's Opinion] (Dkt. ## 19, 28); Defendant's Motion in Limine Regarding Stolen Firearm (Dkt. # 20); Defendant's Motion in Limine Regarding Defendant's Status on Supervised Release (Dkt. # 21); Defendant's Motion in Limine Excluding Prior Convictions for Impeachment Purposes (Dkt. # 22); Defendant's Motion for Bifurcated Trial and Brief in Support (Dkt. # 23); Defendant's Motion to Suppress Statements and Brief in Support (Dkt. # 26); Defendant's Motion to Suppress Evidence (Dkt. # 27); Defendant's Motion in Limine Regarding Observations and Opinions of Officer (Dkt. # 29); and the government's Motion in Limine (Dkt. # 30). The government has responded to each of defendant's motions. The Court held an evidentiary hearing on the motions to suppress (Dkt. # # 26, 27) on February 12, 2013.

**Background**

On October 11, 2012 at approximately 10:25 p.m., Tulsa Police Department (TPD) Officers Adam Dawson and Christopher Korey Scott of the Special Investigations Division Organized Gang Unit were on patrol near 500 East 43rd Street North in Tulsa, Oklahoma. While driving west on

43rd Street, they observed a new silver Dodge Challenger with a 2012 paper tag that was stopped in the road and impeding traffic. The vehicle was stopped in front of a residence and Dawson knew that two brothers who lived at the residence, Darrell Jackson and DeMarco Jackson, were members of the 107 Hoover Crip gang. When the officers got closer to the vehicle, they saw a black male with dreadlocks leaning into the vehicle, and Dawson thought he recognized this individual from previous encounters as Darrell Jackson, also known as "Wax." Officer Scott testified that he recognized the person as Darrell Jackson. Jackson looked at Dawson and began to walk toward the residence. However, Jackson kept looking over his shoulder and Dawson suspected that Jackson and the persons in the vehicle were aware that police were present. Dawson yelled out the window to ask if "Wax" would talk to him, but Jackson began to walk towards the residence faster. Dawson found this unusual because he regularly talked to Jackson, and Jackson was ordinarily communicative and respectful to Dawson.

Another vehicle pulled up behind the Challenger but had to stop because the Challenger was impeding traffic, and the Challenger started driving quickly away east on 43rd Street. Based on what they had observed, the officers were suspicious that criminal activity was afoot and they intended to stop the Challenger for impeding traffic. They attempted to initiate a traffic stop, but they realized they were traveling 80 miles per hour and they were losing ground on the Challenger. After about one and half miles, the officers caught up to the Challenger traveling southbound on North Peoria Avenue between 46th Street North and 36th Street North. The Challenger turned right on a red light without coming to a stop and turned west onto 36th Street North. The officers formed an opinion that the driver of the Challenger had no intention of stopping, and they activated their emergency lights and siren at this point in the pursuit. The Challenger led the officers on a pursuit

2

through a residential neighborhood, and Dawson saw the passenger side door open and close several times. Dawson believed the passenger in the front seat was going to "bail" out of the Challenger and attempt to flee. While the Challenger was traveling west on 35th Street North, a black male exited the Challenger while it was moving at a high rate of speed, and the driver quickly made a right turn. The person who jumped of the vehicle lost his footing and was dragged by the Challenger until he let go. When the person let go, he was run over by the back passenger side tire of the Challenger near his upper legs or pelvis. The Challenger reached a dead end, but it drove through a metal fence and into an open field.

Scott jumped out of the patrol car to attend to the person who had exited the Challenger. Dawson was unable to continue pursuit of the Challenger and he radioed other patrol units in the area to continue the pursuit. Scott placed the person in handcuffs for officer safety, and he observed that the person's leg was broken. Scott asked the person to identify himself, and he stated that his name was Roberto Madden. Scott inquired about Madden's injuries. Scott also asked Madden if the Challenger was his vehicle, and Madden replied "yes." Scott testified that his purpose in asking this question to gain information helpful to the investigation. Dawson returned to Scott, and the person who exited the Challenger identified himself to Dawson as Roberto Madden.[1] Dawson testified that he immediately recognized Madden once his flashlight lit up Madden's face, and this happened almost simultaneously as Madden said his name. Dawson had recently attended a meeting and he had learned at the meeting that Madden was a certified member of the 107 Hoover Crip gang who was on federal supervision. He also knew that Madden had recently had his ankle monitor removed.

---

[1] Dawson later learned that the Challenger had been involved in a prior traffic stop in July 2012. The report from the prior stop by TPD Corporal D. Filak stated that Madden was the driver of the vehicle and he eluded arrest by escaping on foot.

Dawson observed a bone sticking out of Madden's leg. He also saw the magazine of a handgun sticking out of the right pocket of Madden's jeans, and the magazine was in plain sight. Dawson held the gun in place without touching it, and another TPD officer, Officer Upton, brought gloves for Dawson to use when removing the gun from Madden's pocket. Dawson put on the gloves and removed the gun, and the gun was a chamber-loaded SCCY Industries, Model CPX-1, 9mm caliber semi-automatic pistol with an additional nine rounds of ammunition in the magazine. Madden immediately said "that's not my gun" and his statement was not made in response to any question posed by police officers. Madden was arrested at the scene.

Dawson conducted a search of Madden incident to arrest, and recovered a single pill of Xanax, $204 in United States currency, two iPhones, a marijuana cigarette, and an additional $10.25 from Madden's left jacket pocket. Dawson saw the name "Wax" as an incoming call on the screen of one of the iPhones. Madden was taken to the hospital. After working the scene of the collision and collecting additional evidence, Dawson and Scott went to the hospital and spoke to Madden. Scott initiated the conversation and asked if Madden was in pain. Madden stated that he was in pain and Madden did not believe that he had had any medication. Scott asked Madden if wanted to notify anyone that he was in the hospital, and Madden gave him phone numbers. Scott also asked Madden if he owned the Challenger, and Madden replied "yes." Dawson read Madden his <u>Miranda</u> rights, and Madden agreed to speak to the police. When Dawson questioned Madden about the gun, Madden asked Dawson if the "gun was going to disappear." Dawson repeated the question back to Madden, and Madden again asked if the gun would "disappear." A nurse came into the room and began to manipulate Madden's leg, and the officers decided to end the interrogation when it became apparent that Madden was in significant pain.

4

While Madden was being arrested, other TPD officers continued to pursue the Challenger on a 50 mile chase. TPD Officer Chad Moyer later found the Challenger on the side of the road, and it appeared that the Challenger had run out of gas. The occupants of the Challenger had fled the scene. Moyer recovered evidence from the front passenger side of the Challenger. He seized a black mesh bag containing three baggies of marijuana, digital scales, and baby bottle containing a purple liquid. The marijuana weighed approximately 83.7 grams. He recovered another bottle of purple liquid from under the front passenger seat, and he believed that the purple liquid was "lean" or a cough syrup laced with codeine that is a popular recreational drug. He found an Oklahoma identification card with Madden's name and photograph in a wallet on the front passenger seat. Moyer informed Dawson that Madden's wallet had been found in the Challenger. Moyer also recovered a QuikTrip pump start card from the rear floorboard. The Challenger was towed and placed in storage, and TPD later obtained a search warrant to conduct a full search of the vehicle. Three more cell phones and a video camera were recovered.

On October 15, 2012, a magistrate judge signed a complaint charging defendant with being a felon in possession of firearm. Dkt. # 1. On November 7, 2012, the grand jury returned an indictment charging defendant with possession of a firearm after conviction of a felony in violation of 18 U.S.C. § 922(g)(1) (count one), possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (count two), and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c) (count three). Dkt. # 4. The firearm in counts one and three is the same firearm.

**Defendant's Motion to Suppress Evidence (Dkt. # 27)**

Defendant asks the Court to suppress evidence seized from his person on October 11, 2012, but he does not specify what evidence or under what theory the evidence should be suppressed. Construing defendant's motion broadly, it appears that he is putting the government to its burden of proof to show that no constitutional violation occurred. Dkt. # 27, at 3. The government responds that a firearm was in plain sight and Dawson was aware of defendant's criminal history, and the evidence was properly seized under the plain view doctrine.

Under the plain view doctrine, a police officer may seize evidence if:

(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent-i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (3) the officer had a lawful right of access to the object itself.

United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996) (quoting United States v. Soussi, 29 F.3d 565, 570 (10th Cir. 1994)). Before relying on the plain view doctrine to justify a warrantless seizure, "the fundamental prerequisite . . . is that 'the initial intrusion which brings the police within plain view of such an article' is itself lawful." United States v. Davis, 94 F.3d 1465, 1470 (10th Cir. 1996). "The [plain view] doctrine serves to supplement the prior justification-whether it be a warrant for being present for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused." Id. (quoting Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971)).

In this case, TPD officers observed the Challenger commit numerous traffic violations and the driver of the Challenger led officers on a high-speed pursuit. Madden exited the Challenger while it was traveling at a high rate of speed and he was run over by the Challenger. While looking at Madden, Dawson observed the magazine of a firearm sticking out of Madden's pocket. In terms

6

of the plain view doctrine, Dawson was lawfully in a place where he could observe the item. Based on Dawson's personal knowledge of Madden's prior convictions, the incriminating nature of the item was immediately apparent to Dawson and Dawson had probable cause to arrest Madden. Thus, Dawson also had authority to conduct a search incident to arrest and he had a lawful right to seize the firearm, and no Fourth Amendment violation occurred.

The government also argues that Moyer did not need a warrant to conduct an initial search of the Challenger, because the Challenger was abandoned property in which defendant retained no reasonable expectation of privacy. "The test for abandonment is whether the defendant has retained any reasonable expectation of privacy in the property." United States v. Ojeda-Ramos, 455 F.3d , 1187(10th Cir. 2006) (quoting United States v. Hernandez, 7 F.3d 944, 947 (10th Cir. 1993)). Abandonment has a subjective and an objective component. United States v. Garzon, 119 F.3d 1446, 1449 (10th Cir. 1997). Defendant must have subjectively intended to maintain possession of the property and he must also have an objectively reasonable expectation of privacy in the property. Id. By jumping out of the vehicle, it would have been reasonable for police officers to believe that Madden was abandoning the vehicle. The Court also takes into account where the vehicle was found and a person does not have a reasonable expectation of privacy in a vehicle that has been left unlocked on the side of a road. Under these circumstances, defendant abandoned the Challenger and he had no reasonable expectation of privacy in the vehicle. The motion to suppress evidence (Dkt. # 27) is denied.

**Defendant's Motion to Suppress Statements (Dkt. # 26)**

Defendant claims that he was not given a Miranda warning before he was initially interrogated and, even after he received a Miranda warning, he was in significant pain and his

waiver was not voluntary. The government responds that defendant was not in such serious pain that his Miranda waiver should be deemed involuntary, and certain statements of defendant were made spontaneously and not in response to interrogation.

In Miranda v. United States, 384 U.S. 436 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Under this rule, the court must suppress a statement, even if voluntary, if a proper warning was not given before police initiated custodial interrogation of a suspect. United States v. Patane, 542 U.S. 630 (2004); United States v. McCurdy, 40 F.3d 1111, 1117 (10th Cir. 1994). Once a Miranda warning has been given, police must refrain from interrogating a suspect if he unambiguously invokes his right to silence. Michigan v. Mosley, 423 U.S. 96, 101 (1975). However, a suspect impliedly waives his right to remain silent if he receives a Miranda warning, understands the Miranda warning, and makes an uncoerced statement to police. Berghuis v. Thomkins, 130 S. Ct. 2250, 2262 (2010). The fruit of the poisonous tree rule does not apply even if defendant successfully proves that police obtained a statement through custodial interrogation without giving a Miranda warning. United States v. Pettigrew, 468 F.3d 626, 636 (10th Cir. 2006). The Miranda exclusionary rule requires only that the court exclude any "unwarned statement" itself. Oregon v. Elstad, 470 U.S. 298, 307 (1985). Even if police obtain a statement from a suspect in violation of Miranda, this does not taint a subsequent warned confession or statement if the statement was voluntarily made. Elstad, 470 U.S. at 309; Pettigrew, 468 F.3d at 635.

In this case, defendant made certain statements when he was found after being run over by the Challenger, and he made additional statements at the hospital. At the scene of the collision, defendant stated immediately after the accident "that's not my gun." Dawson testified that defendant made this statement after Dawson removed the gun, and that he did not ask defendant any questions concerning the gun. Statements that are volunteered by a suspect and not made in response to questioning are admissible even if the suspect did not receive a <u>Miranda</u> warning. <u>United States v. Pettigrew</u>, 468 F.3d 626, 633-34 (10th Cir. 2006). There is no evidence suggesting that defendant's statement "that's not my gun" was made in response to questioning by Dawson, and the statement is admissible at trial. However, before making the statement concerning the gun, Scott had asked Madden if the Challenger was his car, and Madden replied "yes." Scott testified that his purpose in asking the question was investigatory. Unlike the statement about the gun, Madden's response to Scott's question was not a voluntary and spontaneous statement, and Madden should have been given a <u>Miranda</u> warning before Scott posed potentially incriminating questions to Madden. Madden's response to Scott's question concerning ownership of the Challenger was an unwarned statement made during a custodial investigation, and this statement is not admissible.

After defendant was arrested, he was taken to the hospital and he was interviewed by Dawson and Scott. The Court has heard Dawson's and Scott's testimony concerning their post-arrest communications with defendant and the Court has also listened to an audiorecording of defendant's conversation with Dawson and Scott. Before defendant was given a <u>Miranda</u> warning, Scott asked defendant some initial question about his injuries and if he wanted the police to notify anyone that he was in the hospital. Scott also asked defendant if he owned the Challenger, and defendant stated that he did own the vehicle. At that point, Dawson read defendant a <u>Miranda</u>

9

warning and asked defendant about the gun found on his person. Defendant initially acted confused but he then asked if the gun would "disappear." Dawson repeated the question back to defendant, and defendant again asked if the gun would disappear. In his motion to suppress statements, defendant argues that the statement concerning ownership of the Challenger is incriminating and it was made before he received a Miranda warning. The Court agrees that this statement could potentially be incriminating and no Miranda warning had been given when the statement was made. Thus, defendant's statement concerning ownership of the Challenger is not admissible at trial. However, this does not taint the admissibility of any subsequent statements made by defendant following a voluntary waiver of his Miranda rights and, if the Court finds that defendant's Miranda waiver was voluntary, Madden's statements about the "disappearance" of the gun will be admissible. Elstad, 470 U.S. at 309.

Defendant argues that any statements made after the Miranda warning are inadmissible, because his waiver of his Miranda rights was involuntary. The government bears the burden to prove by a preponderance of the evidence that defendant voluntarily waived his Miranda rights. Colorado v. Connelly, 479 U.S. 157, 168-69 (1986). The Court must consider the totality of the circumstances to determine whether defendant's waiver was voluntary. Hernandez, 93 F.3d at 1051. The Tenth Circuit has identified five factors that should be considered to determine whether a Miranda waiver was voluntary:

> (1) the age, intelligence, and education of the defendant; (2) the length of [any] detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of [his or] her constitutional rights; and (5) whether the defendant was subjected to physical punishment."

United States v. Carrizales-Toledo, 454 F.3d 1142 (10th Cir. 2006) (quoting United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997)). These factors are not exclusive and a court should consider

any other evidence showing that "the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." Id. (quoting United States v. Rith, 164 F.3d 1323, 1333 (10th Cir. 1999)).

It is reasonable to assume that defendant was in pain after he was run over by the Challenger, but this does not automatically render his Miranda waiver involuntary. He received a Miranda warning and acknowledged that he understood those rights. The questioning was not lengthy and defendant understood Dawson's questions, and there are no facts suggesting that he was subject to physical or psychological coercion. The Court also notes that defendant asked for the gun to "disappear," and this supports a finding that he understood the what was happening and the consequence of any statement he made. Dawson testified that he decided to end the interview when it became apparent that defendant was in too much pain to continue, and this supports a finding that police were not attempting to use defendant's pain as a means to coerce him into making a involuntary incriminating statement. The Court finds that the government has met its burden to show that defendant's Miranda waiver was voluntary, and any statement made by defendant at the hospital after his Miranda warning is admissible. The motion to suppress statements (Dkt. # 26) is granted in part and denied in part.

**Defendant's Motion to Bifurcate (Dkt. # 23)**

Defendant asks the Court to bifurcate the jury trial and to require the jury to reach verdicts as to counts two and three before hearing evidence as to count one, because evidence of his prior felony conviction is relevant only to count one. The government responds that the charges against Madden arise out of the same set of facts and joinder of all counts for a single trial is appropriate.

11

Dkt. # 34, at 9. The government also argues that the fact of defendant's prior convictions is not so inherently prejudicial that bifurcation is required. Id. at 12.

An indictment may charge a defendant with multiple offenses if the offenses "are of the same or similar character, or are based on the same transaction, or are connected with or constitute parts of a common scheme or plan. Fed. R. Crim. P. 8(a). Under Fed. R. Crim. P 14, "[i]f the joinder of offense . . . in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trials of counts . . . ." When seeking bifurcation or severance, defendant bears the burden to show that a joint trial of all counts will result in "actual prejudice" and the prejudice would outweigh the interest of judicial economy. United States v. Hutchinson, 573 F.3d 1011, 1025 (10th Cir. 2009). The mere fact that a felon in possession charge may be tried with other charges is not sufficient to show that a defendant will be prejudiced. United States v. Jones, 213 F.3d 1253, 1260 (10th Cir. 2000). Any prejudice that would arise from admission of a defendant's prior felony conviction can be lessened if the details of the prior conviction are not disclosed to the jury. United States v. Valentine, 706 F.2d 282, 290 (10th Cir. 1983). Limiting instructions can also be used to reduce any prejudice that would be caused by the admission of a stipulation concerning a defendant's prior felony conviction. United States v. Patterson, 20 F.3d 809, 816 (10th Cir. 1994).

The Court has reviewed defendant's motion and finds that he has not met his burden to show that any prejudice caused by a joint trial on all pending charges outweighs the interests of judicial economy. Evidence concerning defendant's possession of a firearm will be admissible even if the trial is bifurcated, because both counts one and three concern possession of the same firearm. When there is a substantial overlap of the evidence as to multiple counts, the interests of judicial economy strongly favor a joint trial of all counts. United States v. Burkley, 513 F.3d 1183, 1188 (10th Cir.

2008). Defendant may stipulate to the fact of his prior felony conviction, and the government has agreed that it will not place undue emphasis on this fact. Dkt. # 34, at 10. This is ordinarily sufficient to relieve any unfair prejudice caused by admission of defendant's prior felony convictions in a § 922(g) prosecution. See United States v. Sturmoski, 971 F.2d 452, 460 (10th Cir. 1992). In any case when multiple charges are tried in a single trial, the Court will instruct the jury that evidence as to each count should be considered separately and the Court can presume that the jury will follow any limiting instructions. Jones, 213 F.3d at 1261; United States v. Hardwell, 80 F.3d 1471, 1487(10th Cir. 1996). Defendant's motion for a bifurcated trial (Dkt. # 23) is denied.

**Government's Motion in Limine (Dkt. # 30)**

The government requests that all parties and witnesses be prohibited from mentioning the illegal conduct of former TPD officers. Based on defendant's motions in limine, there is at least a suggestion that he intended to raise this issue. In particular, defendant claims that his statement to police officers as to whether the firearm found on his person could "disappear" was made because he believed that a corrupt police officer would steal the firearm. Dkt. # 19, at 4. At the evidentiary hearing, defense counsel clarified that defendant has no evidence linking the police officers involved in this case to allegations of police corruption, and he does not intend to offer evidence or make any argument concerning police misconduct. If he subsequently discovers evidence of this nature, defense counsel states that he will advise the government and the Court before presenting any evidence that relates to police misconduct. Based on defense counsel's representation that defendant does not currently intend to offer evidence of police misconduct, the government's motion in limine (Dkt. # 30) is granted.

**Defendant's Motions in Limine**

Gang Affiliation (Dkt. # 18)

Defendant asks the Court to exclude evidence that he was affiliated with a gang or that the investigation leading to his arrest was gang-related. Defendant uses the term "gang-related" to include evidence that the officers involved in this case are part of an anti-gang unit. Dkt. # 18, at 1. Evidence of a defendant's gang membership or affiliation often has probative value, but this value can be outweighed by the risk of unfair prejudice to a defendant. United States v. Hartsfield, 976 F.2d 1349, 1352 (10th Cir. 1992); United States v. Keys, 899 F.2d 983, 986-88 (10th Cir. 1990). Under some circumstances, evidence of gang membership can be relevant to show the existence of a conspiracy or that witnesses may be biased in favor of the defendant based on a gang affiliation. United States v. Brown, 200 F.3d 700, 708 (10th Cir. 1999). This is not a conspiracy case and evidence of gang membership is not directly relevant to the criminal charges. The government agrees not to elicit any statement that the investigation was gang-related or that the officers were part of an anti-gang unit. However, the government argues that evidence of defendant's gang-affiliation may be helpful when assessing the credibility of certain witnesses, because this evidence shows that a witness' testimony may be affected by a witness' fear or bias based on defendant's gang membership. The government will request a limiting instruction if this type of testimony is elicited at trial. Dkt. # 32, at 3-5. Testimony concerning a defendant's gang affiliation may be admitted to show that the witness and the defendant have a common gang membership or that the witness's testimony is biased due to fear. United States v. Elkins, 70 F.3d 81, 84 (10th Cir. 1995). However, the government must first lay a foundation to elicit this type of testimony. Evidence of gang affiliation has some relevance, but admission of this evidence at trial could significantly prejudice

14

defendant. Based on the government's agreement, defendant's motion in limine (Dkt. # 18) is granted as to evidence that the investigation was gang-related and that the officers were part of anti-gang unit. If the government lays a proper foundation, the Court may allow the government to inquire about common gang membership or a witness' bias or fear.

Defendant's Statement and Officer's Opinion (Dkt. ## 19, 28)

While at the hospital, defendant allegedly asked a police officer if the gun seized from his person would "disappear." He asks the Court to exclude this statement and any inference that he may have been attempting to bribe a police officer. Defendant also claims that his statement could support an inference that he believed that the police officer who allegedly heard the statement would be inclined to steal the firearm for personal gain. Dkt. # 19, at 3. The government responds that this statement tends to show that defendant possessed the firearm in question and it is relevant to the government's case. Defendant is being prosecuted for possession of the firearm, and this statement tends to support a finding that he possessed the firearm. As for defendant's concerns that Dawson or Scott believed defendant was offering a bribe, their testimony does not suggest that they believed defendant was attempting to bribe them and counsel for the government states that it will not elicit any testimony suggesting that defendant was offering a bribe. To the extent that defendant intends to use this statement to inject police corruption into the trial, the government's motion in limine has been granted and defendant must refrain from making any such inferences unless there is a foundation to make allegations of police corruption. Defendant's motions in limine (Dkt. ## 19, 28) are denied.

Stolen Firearm (Dkt. # 20)

Defendant claims that evidence that the firearm he allegedly possessed was stolen is irrelevant and, even if relevant, admission of this evidence would result in unfair prejudice to defendant. The government responds that the fact that the firearm was stolen is relevant to count three and this evidence should be admitted at trial. The Tenth Circuit has provided a list of factors that can be relevant to determine if a defendant possessed a firearm in furtherance of a drug trafficking crime, and "whether the weapon is stolen" is one of those factors. United States v. Rockey, 449 F.3d 1099, 1103 (10th Cir. 2006). This factor is also listed in Tenth Circuit Pattern Criminal Jury Instruction 2.45.1 as one of the eight factors a jury should consider to determine if a defendant is guilty of possessing a firearm in furtherance of a drug trafficking crime. Thus, evidence that the firearm possessed by defendant was stolen is relevant under Rule 401. Defendant argues that this evidence would be unfairly prejudicial because a jury "could draw an unfairly prejudicial inference that Defendant is engaged in burglaries or trading in stolen goods . . . ." Dkt. # 20, at 3. The Court finds that the slight risk that the jury could draw such an inference does not outweigh the probative value of the evidence, and defendant's motion in limine (Dkt. # 20) is denied.

Supervised Release (Dkt. # 21)

Defendant asks the Court to exclude any reference to the fact that he was on supervised release for a federal crime at the time of his arrest. The government does not intend to elicit such testimony from any witness other than the defendant. However, the government states that it will impeach defendant with this evidence if he decides to testify. Defendant's motion in limine (Dkt. # 21) is granted insofar as no witness other than defendant may be questioned about defendant's

supervised release, but it may be appropriate for the government to use this fact to impeach defendant if he testifies at trial.

Impeachment by Prior Conviction (Dkt. # 22)

Defendant claims the government should not be permitted to impeach him with evidence of his prior convictions if he testifies at trial. He states that he intends to enter an Old Chief stipulation and the jury will already be aware that he has a prior felony conviction. When a defendant takes the stand in a criminal case, the government is ordinarily permitted to impeach the defendant with evidence of any prior convictions under Fed. R. Evid. 609(a). United States v. Haslip, 160 F.3d 649, 654 (10th Cir. 1998). Even though defendant intends to enter an Old Chief stipulation, evidence concerning his prior convictions could be used if there is another basis to use the evidence at trial, such as Rule 609, and use of this evidence would not be unfairly prejudicial. United States v. Crawford, 130 F.3d 1321, 1323 (8th Cir. 1997). By taking the stand, a defendant places his credibility at issue and he may forego the protection afforded by the Old Chief stipulation. United States v. Kemp, 546 F.3d 759, 763 (6th Cir. 2008). This case presents a somewhat special circumstance in that both of defendant's prior convictions involve the illegal possession of a firearm. Dkt. # 4; see also United States v. Ortiz, 553 F.2d 782, 789 (2d Cir. 1977) ("In view of the substantial likelihood of prejudice, any decision to permit impeachment by reference to convictions for crimes similar to the one for which a defendant is on trial requires particularly careful consideration by the trial judge of the probative value of the prior convictions."). The government states that it will not "delve into" defendant's prior convictions unless he takes the stand or opens the door to impeachment by prior conviction. Given the similarity between defendant's prior convictions and count one of the indictment, it would be appropriate to prevent impeachment by

17

prior conviction beyond defendant's Old Chief stipulation. However, if the defendant takes the stand, the government will be permitted to ask generally whether defendant has prior felony convictions. Defendant's motion in limine (Dkt. # 22) is granted in part and denied in part.

Exclusion of Detective Dawson's Observations and Opinion that
Defendant was going to flee (Dkt. # 29)

Defendant claims that he will be unfairly prejudiced at trial if Dawson is permitted to testify that defendant was "going to flee" from the Challenger during the pursuit. He claims that he was simply attempting to exit the vehicle and the jury should not be permitted to speculate that he was attempting to flee. Dkt. # 29, at 3-4. The government responds that Dawson's opinion is relevant, because it was reasonable for Dawson to believe that defendant was attempting to flee and evade arrest. Under Fed. R. Civ. P. 701, lay opinion testimony is admissible if the opinion is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determine a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Defendant cites United States v. Stanley, 896 F.2d 450 (10th Cir. 1990), and argues that opinion testimony is admissible only if it will help the jury resolve a factual issue that is a necessary part of the government's case. Dkt. # 29, at 2-3. Dawson's opinion that defendant was "going to flee" meets all of the Rule 701 criteria. The opinion is based on Dawson's personal observations during the pursuit of the Challenger, and defendant's conduct during the pursuit is a relevant fact for the jury to consider. Dawson will clearly be testifying as a fact witness and his opinion is not based on any scientific, technical, or specialized knowledge. Defendant is free to argue that he was merely trying to "exit" a vehicle moving at a high rate of speed, but Dawson's observation is relevant to the issue of whether the person jumping was

engaged in criminal activity and would assist the jury. Defendant's motion in limine (Dkt. # 29) is denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion in Limine Regarding Gang Affiliation (Dkt. # 18) is **granted**; Defendant's Motion in Limine Regarding [Defendant's Statement and Officer's Opinion] (Dkt. ## 19, 28) are **denied**; Defendant's Motion in Limine Regarding Stolen Firearm (Dkt. # 20) is **denied**; Defendant's Motion in Limine Regarding Defendant's Status on Supervised Release (Dkt. # 21) is **granted**; Defendant's Motion in Limine Excluding Prior Convictions for Impeachment Purposes (Dkt. # 22) is **granted in part** and **denied in part**; Defendant's Motion for Bifurcated Trial and Brief in Support (Dkt. # 23) is **denied**; Defendant's Motion to Suppress Statements and Brief in Support (Dkt. # 26) is **granted in part** and **denied in part**; Defendant's Motion to Suppress Evidence (Dkt. # 27) is **denied**; Defendant's Motion in Limine Regarding Observations and Opinions of Officer (Dkt. # 29) is **denied**; and the government's Motion in Limine (Dkt. # 30) is **granted**.

**DATED** this 13th day of February, 2013.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE